Argued and submitted October 19, peremptory writ of mandamus to issue immediately, in terms consistent with this opinion dated October 21, 1993

STATE ex rel Phil KEISLING,
Secretary of State,
*Plaintiff-Relator,*

*v.*

The Honorable
Albin W. NORBLAD,
Circuit Court Judge for Marion County,
*Defendant.*

(SC S40689)

860 P2d 241

Michael D. Reynolds, Assistant Attorney General, Salem, argued the cause for plaintiff-relator. With him on the petition for peremptory writ of mandamus/alternative writ of mandamus were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Gregory W. Byrne, of Byrne & Barrow, Portland, argued the cause and filed the answering memorandum for defendant.

Henry Kane, *amicus curiae*, filed a brief *pro se*.

GILLETTE, J.

Unis, J., specially concurred and filed an opinion.

## GILLETTE, J.

The Secretary of State seeks a writ of mandamus directing dismissal of an action that challenges the authority of the Secretary of State to place Ballot Measure 1 on the ballot as a single measure in the November 9, 1993, special statewide election. Pursuant to this decision, a peremptory writ of mandamus shall issue immediately, granting the relief prayed for.

## THE HISTORY OF BALLOT MEASURE 1
## AND THIS PROCEEDING

On August 3, 1993, the legislature adopted House Joint Resolution 10 (HJR 10). HJR 10 proposes to amend the Oregon Constitution by adding new sections to it as follows:

(1)   Article IX, section 10, captioned "State Spending Limit";

(2)   Article XI, section 11g, captioned "School Property Taxes on Homes Abolished";

(3)   Article XI, section 10a, captioned "Limit on Sales Tax Rate";

(4)   Article XV, section 4a, captioned "Dedication of One-Half of Lottery Proceeds to Education";

(5)   Article XVII, section 3, captioned "State Spending Limit, Sales Tax Imposed; School Property Tax Rate Limit Implementation Accelerated; Corporate Tax Increased; Personal Income Tax Decreased"; and

(6)   Article XI, section 10b, captioned "State Spending Limit, School Property Tax Limit for Homes, Sales Tax and Lottery Proceeds Dedication Repealed Unless People Revote-Reapprove."

HJR 10 further provides:

"The amendments proposed by this joint resolution shall be submitted to the people for their approval or rejection at a special election held throughout this state as provided in chapter [604], Oregon Laws 1993 (Enrolled House Bill 3677)."

On August 13, 1993, the Legislative Assembly filed HJR 10 with the Office of the Secretary of State.

House Bill 3677 (HB 3677), codified as Oregon Laws 1993, chapter 604, was signed into law by the Governor on August 6, 1993, the date on which it became effective pursuant to an emergency clause. Or Laws 1993, ch 604, § 11. HB 3677 directs that HJR 10 shall be submitted to the voters at a special statewide election to be held on November 9, 1993. *Id.* at §§ 1, 2. The bill appropriates $1,296,000 from the state's General Fund to pay for the direct expenses of submitting any measure referred by the legislature to the people at that special statewide election. *Id.* at § 10(1).

HB 3677 expressly includes the text of a single ballot title for "the measure referred to in section 1 of this Act [HJR 10]." *Id.* at § 3(1).[1] HB 3677 further expressly provides that "[t]he ballot title prepared under this section shall be the ballot title printed in the voters' pamphlet and on the ballot." *Id.* at § 3(2). That same section mandates that ORS 250.085, providing for judicial review of ballot titles, "shall not apply."

HB 3677 provides for a financial impact estimate process, including a public hearing, and requires the Secretary of State to adopt rules for generating the financial impact estimate. *Id.* at § 4(1). HB 3677 provides that "[t]he financial estimates prepared under this section shall be the estimates printed in the voters' pamphlet and on the ballot." *Id.* at § 4(2). That same section further expressly mandates that ORS 250.131, providing for judicial review of a financial impact estimate, "shall not apply."

The rules adopted by the Secretary of State pursuant to section 4 require that that financial impact estimate process, including a period for public notice and public hearing, be completed and that the Secretary of State have certified the financial impact estimate not later than the 71st day before the election, that is, on or before August 30, 1993.

---

[1] The ballot title set forth in the Act is different in form from the ordinary ballot title: This title has no caption, it begins with a question, and contains a series of statements that exceed the usual statutory word limit for ballot title summaries. *Compare* Or Laws 1993, ch 604, § 3(1) *with* ORS 250.035. The legislature has provided for its authority to prepare its own ballot title for a measure that it refers to the electorate, pursuant to ORS 250.075(1), which provides:

"When the Legislative Assembly refers a measure to the people, a ballot title for the measure may be prepared by the assembly. The ballot title shall be filed with the Secretary of State when the measure is filed with the Secretary of State."

Temporary Rule 165-07-100(2). The Secretary of State certified the financial impact estimate on August 30, 1993.

HB 3677 also provides for an explanatory statement process for the measure, with the Secretary of State to establish deadlines for the process, including deadlines for selection of a committee charged with drafting the explanatory statement, for the required public hearing, and for filing of the statement. Or Laws 1993, ch 604, §§ 4(3), 4(4). Unlike the process related to the ballot title and the financial impact estimate for the measure, both of which the legislature has directed are to be placed on the ballot without any judicial review, HB 3677 provides for limited judicial review of the explanatory statement that is not printed in the Voters' Pamphlet. *Id.* at § 4(5). Specifically, the statute permits "[a]ny person dissatisfied with an explanatory statement" to challenge the statement in court, with two material limitations. The first limitation is that the challenge must be brought by petition to the Supreme Court; the second is that the challenge must be filed not later than the third calendar day after the filing deadline for the explanatory statement. *Ibid.*

The temporary rules adopted by the Secretary of State pursuant to HB 3677, section 4, link the timing for the explanatory statement process to the timing for the financial impact estimate process. The Secretary of State must certify the explanatory statement by not later than the 71st day before the election, *i.e.*, on or before August 30, 1993. Temporary Rule 165-07-100(2). The Secretary of State certified the explanatory statement on August 30, 1993. Pursuant to section 4(5)(a) of HB 3677, the period for filing a challenge in this court to the explanatory statement thus expired on September 2, 1993. No petition challenging the explanatory statement was filed in this court.

HB 3677 also requires the Secretary of State to prepare and deliver to the counties, "by the most expeditious means practicable," a certified statement of the measure, together with the ballot title and the fiscal impact estimate. *Id.* at § 7(1). ORS 254.085(1) provides that the Secretary of State shall furnish to each county clerk, not later than the 61st day before the election, *i.e.*, on or before September 9, 1993, a certified statement of the "state measures to be voted

on" in that election. The same statute provides that "[i]ncluded with each state measure shall be the measure number, the ballot title * * * and, if applicable, the financial estimates under ORS 250.125." ORS 254.085(3). On September 2, 1993, the Secretary of State certified HJR 10 to the counties as Ballot Measure 1, including the ballot title provided by HB 3677, section 3(1), and the financial impact estimate produced by the process outlined above.

In summary, HB 3677 *precludes* judicial review of the ballot title and financial impact estimates for HJR 10. Those are the *only items* that are actually printed on the ballot that the Secretary of State certifies to the counties, along with the ballot measure number. Or Laws 1993, ch 604, § 7(2). To the extent that HB 3677 permits *any* judicial review related to HJR 10, it provides that a challenge to the explanatory statement is to be brought directly in the Supreme Court by no later than September 2, 1993.

HB 3677 directs, not only that an election be held concerning the ballot measure, but also that the election be held on November 9, 1993. *Id.* at §§ 2(1), 2(2). Absentee ballots for the election must, by law, be printed by no later than the 45th day before this special election, *i.e.*, September 25, 1993. ORS 253.045, *as amended by* Or Laws 1993, ch 713, § 56.

On September 22, 1993, Joe W. Foxall, Jr., plaintiff in the circuit court action underlying this mandamus proceeding, wrote a letter to the Secretary of State. In that letter, Foxall stated the opinion that HJR 10 proposes four separate amendments to the constitution and inquired whether the temporary rules adopted by the Secretary of State for the conduct of the November 9 election would provide for voting separately on each of those four sections of HJR 10, as Foxall asserted was required by Article XVII, section 1, of the Oregon Constitution.

Article XVII, section 1, of the Oregon Constitution, provides in part:

"When two or more amendments shall be submitted in the manner aforesaid [including by referral from the legislature] to the voters of this state at the same time, they shall be so

submitted that each amendment shall be voted on separately."

On September 29, 1993, the Director of the Elections Division of the Office of the Secretary of State replied to Foxall by a letter that stated in part:

"House Joint Resolution 10 (1993) and HB 3677 clearly direct the Secretary of State to place one measure on the ballot, and provides the Secretary of State with one ballot title for this measure. The Secretary of State has no authority to take the action you request. The rules the Secretary of State adopted to conduct the election carry out the legislative direction to conduct an election on one measure."

On or about October 3, 1993, Foxall filed a complaint in Circuit Court for Marion County, seeking a judgment declaring that Article XVII, section 1, of the Oregon Constitution, requires HJR 10 to be submitted to the voters as four separate measures and directing the Secretary of State so to submit the amendments or, alternatively, a judgment declaring that HJR 10 is void. The complaint contains three separate substantive claims for relief,[2] each with the same underlying constitutional premise.

The first claim is brought pursuant to ORS 246.910, which authorizes circuit court challenges to "any act or failure to act by the Secretary of State * * * under any election law." The second claim seeks a declaratory judgment pursuant to ORS 28.020. The third claim asserts that the September 29 letter from the Office of the Secretary of State responding to Foxall's September 22 letter is an order in other than a contested case. Orders in other than contested cases are reviewable in the circuit court under the Oregon Administrative Procedures Act. ORS 183.484.

Pursuant to ORCP 79, Foxall moved for a preliminary injunction granting the relief sought in his complaint. The Secretary of State moved to dismiss Foxall's complaint, on the ground that, because he lacked authority to do what plaintiff sought to have him do, the circuit court lacked subject matter jurisdiction over a pre-election challenge based on Article XVII, section 1, and that Foxall's claims

---

[2] There is also a fourth claim for attorney fees.

failed to allege ultimate facts sufficient to state claims for relief under Article XVII, section 1.

On October 13, 1993, defendant judge, a judge of the Circuit Court for Marion County, denied the Secretary of State's motion to dismiss the complaint and granted Foxall's motion for a preliminary injunction. The court issued an order enjoining the Secretary of State, pending trial on the merits of Foxall's claims, "from submitting the constitutional amendments proposed by HJR 10 to the voters as a single measure, as such action would violate Article XVII, Section 1, of the Oregon Constitution."

On October 14, 1993, the Secretary of State petitioned this court for either a peremptory or an alternative writ of mandamus, seeking to compel defendant judge to: (1) vacate the order of preliminary injunction; (2) vacate the order denying the Secretary of State's motion to dismiss the complaint; and (3) grant the Secretary of State's motion to dismiss the complaint. The Secretary of State also moved this court for a stay of the preliminary injunction order.

On October 14, 1993, this court granted the Secretary of State's motion to stay the preliminary injunction order. On October 15, 1993, this court issued an alternative writ of mandamus requiring defendant judge to do those things sought by the Secretary of State in the mandamus petition or to show cause why he has not done so, by 3:00 p.m. on October 19, 1993, the time appointed for oral argument on the issue of whether this court should issue a peremptory writ of mandamus.

Also on October 15, 1993, this court directed the following question to the parties in anticipation of oral argument:

> "Please be prepared to discuss the timeliness of the filing of plaintiff's complaint in the circuit court. Specifically: Did the trial court abuse its discretion in issuing a preliminary injunction, in the light of the limits on judicial review and time-lines in HB 3677 and other applicable time-line requirements, *e.g.*, ORS 253.045, as amended by [Oregon Laws 1993, chapter 713, section 56] (relating to * * * absentee ballots). *See generally Ellis v. Roberts*, 302 Or 6, 725 P2d 886 (1986); *State ex rel Fidanque v. Paulus*, 297 Or 711, 688 P2d 1303 (1984)."

Defendant judge elected to show cause rather than to comply with the alternative writ. The parties submitted written responses to the court's question, and oral argument was held in this court on October 19, 1993, at which time the parties addressed themselves, *inter alia*, to the question stated above.

## MANDAMUS IS APPROPRIATE
## TO REVIEW DEFENDANT JUDGE'S
## ACTIONS IN THIS CASE

■        ORS 34.110 provides that a writ of mandamus "shall not be issued in any case where there is a plain, speedy and adequate remedy in the ordinary course of the law." Because appeal is not ordinarily available from an interlocutory order, including an order granting a motion for a preliminary injunction or an order denying a motion to dismiss, ORS 19.010, there is no "plain, speedy and adequate remedy," other than mandamus, for the Secretary of State to challenge defendant judge's actions in this case, which have altered materially the *status quo ante*. The alternative remedy provision of ORS 34.110 does not, therefore, purport to limit this court's discretionary original jurisdiction to issue a writ of mandamus in this case. *See also* Or Const, Art VII (Amended), § 2 ("the supreme court may, in its own discretion, take original jurisdiction in mandamus").

■        Although the issuance of a preliminary injunction is a matter committed to the discretion of the trial court, and ORS 34.110 provides that mandamus "shall not control judicial discretion," the Secretary of State argues in this mandamus proceeding that the trial court acted outside the bounds of legal authority when it issued a preliminary injunction that requires the Secretary of State to split the measure or remove it from the ballot. A claim of fundamental legal error underlying a trial court's exercise of discretion, such as the legal errors asserted by the Secretary of State in defendant judge's rulings in this case, may be raised on mandamus. *See Riesland v. Bailey*, 146 Or 574, 578-80, 31 P2d 183 (1934) (it is well-settled that actions outside the permissible range of a grant of discretion are reviewable in mandamus). In addition, this court may consider on mandamus whether a trial court's actions are outside the permissible range of discretionary choices open to the trial court. *Ibid.*

## PLAINTIFF'S COMPLAINT WAS UNTIMELY, AND THE CIRCUIT COURT ERRED IN GRANTING PLAINTIFF RELIEF UNDER THE COMPLAINT

### A. *Alleged failure to state a claim.*

The Secretary of State, relator in this mandamus proceeding, argues at the outset that defendant judge should have dismissed the underlying proceedings, because the Secretary of State has no authority by virtue of that office to interfere with the referral of a measure by the legislature to the people under Article XVII, section 1. We need not consider that contention, however, where we identify an alternative basis under which relator should have been entitled to the same outcome. As we shall show, we have identified such an alternative basis, *viz.*, lack of timeliness in plaintiff's request for relief.

At least one general decisional principle also militates against deciding the issue that relator propounds. In order to sustain relator's argument, it would be necessary to construe the constitutional powers of a constitutional officer and member of one branch of the government — the Secretary of State — in light of the constitutional powers and prerogatives of a second branch of government — the legislature, as well as to consider the independent constitutional authority of the third branch, the judiciary, to direct executive enforcement of plaintiff's asserted constitutional rights under Article XVII, section 1. Any opinion on such a subject would have potentially profound and sweeping consequences.

It is the usual practice of this court to decide controversies before it on subconstitutional grounds, where such grounds are decisionally appropriate, notwithstanding a party's desire to frame a case in purely constitutional terms. *See Zockert v. Fanning*, 310 Or 514, 520, 800 P2d 773 (1990) ("This court decides cases upon subconstitutional grounds, where available, even though litigants argue only constitutional errors."); *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (to the same effect). The reasons for the rule are especially apparent when this court confronts an unnaturally short period of time within which to issue a decision, as in this case. And, although it is true that a constitutional argument aimed at a potentially decisive question can be a particularly

appealing one, we consider the judicial restraint implicit in the preference for subconstitutional decisions to be the better policy to follow.

## B. *Importance of timely electoral challenge.*

■        We begin with a basic principle: Whenever any court is asked to order a change in the election process, especially a late change in a time-sensitive process, extreme institutional caution should be exercised by the judicial branch. *See Ellis v. Roberts, supra,* 302 Or 6, 12, 16, 725 P2d 886 (1986) (rejecting, based on an "untimely" filing, a circuit court challenge based on the "single subject" requirement of Article IV, section 1(2)(d), and quoting with approval from *State ex rel Fidanque v. Paulus, supra,* 297 Or 711, 718, 719, 688 P2d 1303 (1984)).

■        In this case, as in all pre-election challenges to the electoral process, defendant judge was required to consider the timeliness of plaintiff's action in considering whether plaintiff was entitled to any relief altering the established electoral process. *See State ex rel Bunn v. Roberts,* 302 Or 72, 82-83, 726 P2d 925 (1986) (affirming on appeal the dismissal of a mandamus on timeliness grounds even though the trial court relied on other grounds for the dismissal). That is particularly so where the relief sought was within the trial court's discretion, as was true with respect to the issuance of a preliminary injunction in the present case.

In *State ex rel Fidanque v. Paulus, supra,* this court refused to examine the merits of the relators' assertion that the Secretary of State had a duty before the election to consider a "one subject only" challenge to an initiative under Article IV of the Oregon Constitution.[3] Focusing on the late timing of the challenge and the institutional interests at stake, the court held:

> "In light of the great value ascribed to the exercise of the initiative power by the people, by the Oregon Constitution, and the courts and the substantially negative impact that rushed, last minute reviews would have on the exercise of the

_____

[3] The merits of that contention later were resolved in *OEA v. Roberts,* 301 Or 228, 721 P2d 833 (1986), which held that the Secretary of State has a duty to examine proposed initiative ballot measures for compliance with the "one subject only" rule of Article IV of the Oregon Constitution.

initiative power, this court has been and should be very wary of last minute challenges.

"\* \* \* \* \*

"In view of the presumption favoring the exercise of the initiative power, the lack of any adequate reason given by the Plaintiff-Relators for their delay in making this challenge until the eleventh hour and the potential availability of post-election challenge under Article IV, section 20, [of the Oregon Constitution,] should Ballot Measure 8 ultimately be approved, it is not unreasonable to hold that Plaintiff-Relators' challenge was not timely." 297 Or at 718-19 (citation omitted).

Every one of the reasons for the holding in *Fidanque* applies with at least equal force in this case.[4] The same value placed on the initiative power in *Ellis* and *Fidanque* obviously applies to the coordinate power of the legislature to refer a measure to the people for a vote. Indeed, that value is, if anything, heightened in this case, where the legislature expressly has directed that HJR 10 be submitted to the people at an election on November 9, 1993, and where the executive official in charge of elections, the Secretary of State, has acted to carry out that directive so that nothing material remains to be done by either branch of the government before the election occurs.

Defendant judge in this case was asked by plaintiff to enter a preliminary injunction that would materially alter the *status quo ante* in an electoral process that had begun at least two months before the October 13, 1993, hearing on plaintiff's motion for the injunction and that was scheduled to come to fruition in a statewide special election on the measure 27 days later, on November 9, 1993. Pursuant to this court's prior directives about the role of the courts in considering pre-election challenges to the electoral process, defendant judge was required to consider, as critical factors in entertaining

---

[4] The timeliness rationale in *State ex rel Fidanque v. Paulus*, 297 Or 711, 688 P2d 1303 (1984), wherein the court considered the timeliness of a mandamus action filed directly *in the Supreme Court* challenging the electoral conduct of the Secretary of State, was extended to consideration of the timeliness of actions brought against the Secretary of State *in the circuit court* in *Ellis v. Roberts*, 302 Or 6, 725 P2d 886 (1986). Although the *Ellis* case reached this court through appeal to the Court of Appeals and certification of the appeal to this court, while the present case is before us on mandamus, we do not consider that procedural difference to be material to our decision.

plaintiff's request for relief, at what point during the electoral process the court challenge was brought and, therefore, at what point during the electoral process any resulting injunction would take effect.

Foxall, plaintiff below, asserts that his challenge to Ballot Measure 1 was timely in any event, because he filed his challenge within the 60-day limit permitted by ORS 183.484(2)[5] for seeking review of orders in other than contested cases. Relator concedes that relator's certification of Ballot Measure 1 to the county elections officers was an order in other than a contested case, as that concept is defined in ORS 183.310(5) and 183.484(1).[6] Plaintiff's challenge to Ballot Measure 1 was filed within 60 days of the issuance of that order.[7] Neither party raised or argued the question of timeliness before the defendant judge. Both parties assume from the foregoing facts that plaintiff's complaint was timely; both rely for that proposition on this court's decision in *Ellis v. Roberts, supra.* An examination of that case shows, however, that both parties are mistaken.

The circuit court action in *Ellis* was brought pursuant to ORS 246.910 and the declaratory judgments act, ORS 28.020. *Ellis v. Roberts, supra,* 302 Or at 6. Lacking an express statutory time limit for those actions, the court looked *by analogy* to the 60-day time limit for a circuit court challenge to an order in other than a contested case (which is

---

[5] ORS 183.484(2) provides:

"Petitions for review [of orders other than in contested cases] shall be filed within 60 days only following the date the order [from which review is sought] is served * * *."

[6] ORS 183.310(5) defines an "order" as "any agency action expressed orally or in writing directed to a named person or named persons, other than employees, officers or members of an agency."

ORS 183.484(1) provides:

"Jurisdiction for judicial review of orders [in] other than contested cases is conferred upon the Circuit Court for Marion County and upon the circuit court for the county in which the petitioner resides or has a principal business office. Proceedings for review under this section shall be instituted by filing a petition in the Circuit Court for Marion County or the circuit court for the county in which the petitioner resides or has a principal business office."

[7] In fact, plaintiff's complaint characterized relator's later, September 29, 1993, *letter* to plaintiff as the "order" but, in view of relator's concession — which we accept — that he did issue an order in other than a contested case during the pertinent statutory time frame, we address this issue on its merits.

how the court characterized, in administrative law terms, the Secretary of State's act of certifying the ballot title). *Id.* at 18.

It is clear that several factors formed the basis of the court's decision to adopt the 60-day time period as a reasonable one in *Ellis*. First, the court noted the timing of events in that case: The triggering event of ballot title certification occurred more than 11 months before the plaintiffs filed their court challenge to placement of the measure on the November 1986 ballot and more than 13 months before the court challenge reached the Supreme Court on certified appeal. *Id.* at 17-18. *Ellis* quoted, at length and with approval, from the court's earlier decision in *State ex rel Fidanque v. Paulus, supra,* regarding the court's reasons for extreme caution in entertaining time-sensitive pre-election challenges to the election process. 302 Or at 14-17. The court also emphasized the importance of providing some opportunity for the challenge, taking into account both the time between the certification and the election (15 months), as well as the fact that many members of the public would not necessarily even know of the existence of a proposed ballot measure (much less consider a constitutional challenge to it) until the Secretary of State certified a ballot title for the petition. *Id.* at 14-18. Finally, the court noted all of the foregoing considerations in the context of a decision that it announced six weeks before the relevant election, not the two and one-half weeks available in the present case.

What is striking, in addition to the foregoing analysis, is what the court in *Ellis* did *not* say. The court did *not* say that, treating the action in that case as a petition for judicial review of an order in other than a contested case, such a petition always would be timely. To the contrary, it is clear from that opinion that the requirement of "timeliness" is a principle derived from the fundamental need for the orderly conduct of the election process. *Ellis* thus stood for the proposition that *the maximum amount* of time that the complaining parties in that case had in which to file their challenge was 60 days. The case in no sense stood for the proposition that, no matter what the compression in the timelines for conduct of a particular election, a challenge filed within 60 days *always* would be timely. As an illustration of that point, see *State ex rel Bunn v. Roberts,* 302 Or 72, 726

P2d 925 (1986) (permitting only a five-day period within which to challenge a particular determination of the Secretary of State).

## C. *August 6, 1993, is the commencement date for determining the timeliness of plaintiff's complaint.*

In *Ellis v. Roberts, supra,* this court established a methodology for determining the time period within which a court is permitted to consider a pre-election challenge to the election process in an action for which there is no statutorily prescribed deadline for initiating the action. The court first concluded that such actions must be filed within a "reasonable time." *Ellis v. Roberts, supra,* 302 Or at 13-17. Second, the court concluded that "[t]here is a season for each kind of challenge to the Secretary of State's administration of the election laws" and proceeded to examine the triggering event for determining the timeliness of the court challenge in that case. *Id.* at 17-18.

The court in *Ellis* determined that, in the case of an initiative measure, the reasonable time period for a constitutional "one subject only" challenge to the measure begins to run when the Secretary of State makes the "original constitutional evaluation that is supposed to be the predicate for placing the entire initiative machinery in operation." *Id.* at 17. The court, accordingly, held that the triggering event was the certification by the Secretary of State of a ballot title for the petition. *Id.* at 17-18.

In this case, the equivalent triggering event in the process is easier to determine. Unlike the process in which an initiative petition is submitted by a few people to the Secretary of State for certification, the process leading up to the approval and referral of HJR 10 — the origination process — was quite public. An Article XVII, section 1, challenge to HJR 10 could have been filed as early as August 6, 1993, the effective date of HB 3677, the legislation that directed the Secretary of State to place HJR 10 on the ballot for a special election on November 9, 1993, and that provided the single ballot title for the measure. *See generally* ORS 28.020 (relating to declaratory judgments).

### D. *The reasonable time for filing a court challenge to Ballot Measure 1 based on Article XVII, section 1, ended no later than September 12, 1993.*

In the absence of any express statutory provision relating to the filing of a court challenge to the placement of Ballot Measure 1 on the November ballot as a single amendment, and having determined that a "reasonable" time period for such a challenge began on August 6, 1993, we next consider what, in this case, is the *length* of a "reasonable" time within which a challenge must be brought.

In *Ellis*, the court considered what was a reasonable time period within which the "single subject" constitutional challenge to the Secretary of State's acts may be brought. The court concluded:

> "[T]he answer to this question necessarily must take into consideration the ballot title preparation process. * * *
>
> "The question boils down to this: How long after the ballot title finally is approved and the public at large presumably becomes conversant with the proposed measure is it reasonable to say that actions like the present one reasonably may be brought?" 302 Or at 18.

As already explained, the court in that case concluded that, given the relatively long periods of time involved, a challenge brought within 60 days of the triggering event would be timely. *Id.* at 18.

In *State ex rel Bunn v. Roberts, supra*, this court relied on the methodology established in *Ellis v. Roberts, supra*, and concluded that there was a five-day deadline for filing a court challenge to the Secretary of State's determination that a ballot measure requires an estimate of financial impact. The court based that conclusion on the "inevitably close proximity" between the challenged decision of the Secretary of State and the date of the election at which the ballot measure would be considered and, by analogy, on the five-day statutory deadline for seeking review of an explanatory statement of a ballot measure. 302 Or at 80-82.

■ We turn, then, to consider how long after August 6, 1993, was a reasonable period of time within which plaintiff's court challenge to Ballot Measure 1 could have been brought. In making that determination, we look at other time periods

imposed by law in regard to the preparation of Ballot Measure 1 for submission to the voters, as well as at the total length of time between origination of the measure and the date of the election. *See State ex rel Bunn v. Roberts, supra,* 302 Or at 80-82 (engaging in that analysis); *Ellis v. Roberts, supra,* 302 Or at 18-19 (same).

We already have explained why the 60-day period looked to by analogy and utilized in *Ellis v. Roberts* is inapposite to the timeliness inquiry in this case. That conclusion is bolstered by the pertinent provisions of HB 3677 with respect to challenges to this particular ballot measure and election process.

HB 3677, which directed the Secretary of State to prepare HJR 10 for a November 9, 1993, special statewide election, became law on August 6, 1993, 95 days before the date set for election. The initial stage of the ballot preparation process was required by law to conclude no later than 61 days before the election, *i.e.,* by September 9, 1993, and, in fact, concluded on September 2, 1993.

HB 3677 expressly precluded judicial review of the ballot title and the financial impact estimate, the only items actually on the ballot, items that ordinarily are subject to court challenge. HB 3677 expressly permitted judicial review only of the explanatory statement, and then only by a petition filed directly in the Supreme Court within three days after the statement was certified. Because the explanatory statement was certified on August 30, 1993, the latest possible date for a challenge to the explanatory statement was September 2, 1993.

■ The legislature can, within reasonable limits, circumscribe the time and scope of even constitutional challenges to time-sensitive legislation. *See Seto v. Tri-County Metro. Transportation Dist.,* 311 Or 456, 465-66, 814 P2d 1060 (1991) (rejecting a "future-oriented" constitutional challenge as outside the limited scope mandated by the legislature for the court's direct review of Tri-Met and LUBA's light rail siting decision). The provisions of HB 3677 make clear the legislature's general intent regarding the process of submitting Ballot Measure 1 to the voters. First, the election on HJR 10 is to go forward and will go forward on November

9, 1993. Second, the pre-election process is to proceed without legal challenge, with the narrow exception of a severely time-limited challenge to the explanatory statement. The specific legislation promulgated by the legislature for this measure makes it abundantly clear that the legislature did not want legal challenges to the electoral process to slow or cast a shadow over this measure.

■      In this instance, taking into account the strong policy against last-minute pre-election judicial intervention in a time-sensitive election process, the opportunity that plaintiff and the public had to make an Article XVII, section 1, challenge even before the September 2 certification by the Secretary of State, and looking by analogy to the provisions of HB 3677, we conclude that the "reasonable" time period for filing plaintiff's action ended no later than three days after the date on which it was contemplated by the legislature that the referred measure, together with its accompanying ballot title and fiscal impact estimate, would be certified to the counties. The date by which that certification was by law required to have occurred was September 9, 1993. We thus hold that the reasonable time period in which any pre-election challenge to Ballot Measure 1 had to be brought extended from August 6, 1993, to no later than September 12, 1993. Plaintiff did not file his circuit court action until on or about October 3, 1993. It was not timely.

In light of the foregoing points, and consistent with manifest legislative intent, the trial court's decision to grant plaintiff a preliminary injunction on October 13, 1993, was legal error. Under the principles of timeliness just discussed, plaintiff by that time had no right to any pre-election relief in this case.[8] Pre-election relief was the only kind sought by plaintiff. Therefore, a peremptory writ shall issue (a) vacating

---

[8] We express no opinion on whether the Secretary of State has a duty to review a measure referred by the legislature for compliance with Article XVII, section 1, of the Oregon Constitution, on whether a timely court challenge may be brought before the election asserting that a ballot measure referred by the legislature does not comply with Article XVII, section 1, or on whether Ballot Measure 1 complies with Article XVII, section 1.

Nothing in this opinion should be construed as an expression of this court's agreement, or disagreement, with the legal rulings underlying defendant judge's decision. The effect of this court's ruling is to vacate defendant judge's order granting the preliminary injunction and any statements made therein.

the defendant judge's order granting plaintiff a preliminary injunction and (b) directing that the case be dismissed. *See State ex rel Bunn v. Roberts, supra,* 302 Or at 83 (approving that form of relief).

Peremptory writ of mandamus to issue immediately, in terms consistent with this opinion.

**UNIS, J.,** specially concurring.

I agree, but for different reasons, that a peremptory writ of mandamus should issue (a) vacating defendant judge's order granting plaintiff a preliminary injunction and (b) directing that the case be dismissed.[1]

In my view, defendant judge should have dismissed plaintiff's complaint against the Secretary of State that alleged that House Joint Resolution 10 (Ballot Measure 1) contains more than a single proposed constitutional amendment. Plaintiff failed to plead ultimate facts sufficient to state a claim for relief, ORCP 21 A(8), when he asserted that the Secretary of State had a duty to alter or remove Ballot Measure 1, which was referred by the legislature to the people for their approval.

Article XVII, section 1, of the Oregon Constitution specifies how the legislature may submit a proposed constitutional amendment to the people. The portion of Article XVII, section 1, on which defendant judge relied, provides that when the legislature submits two or more constitutional amendments to the people at the same election, "they shall be so submitted that each amendment shall be voted on separately."

*State ex rel v. Newbry et al,* 189 Or 691, 222 P2d 737 (1950), involved a constitutional amendment proposed by initiative petition. A challenge was brought under Article XVII, alleging "that the proposed amendment is legally insufficient, in that, in violation of Article XVII of the state constitution, it combines as one amendment what are in fact three amendments * * *." *Id.* at 693. This court held that it

---

[1] It is interesting to note that this court reaches the same result that I reach, but on the basis of lack of timeliness in plaintiff's request for relief, even though both parties assert that plaintiff's complaint was timely, and neither party raised or argued the question of timeliness before defendant judge. 317 Or at 627.

could not order the Secretary of State to examine the initiative measure for compliance with Article XVII, section 1. *Id.* at 694-98. The court reasoned that for the judicial branch to determine the constitutionality of the measure in advance of its enactment would be a fundamental interference with the people's legislative authority that would violate separation of powers principles. *Id.* at 697-98. Specifically, this court said that "[a]ny interference by the courts with the enactment of an initiative measure, where all statutory requirements had been complied with, would in itself be a violation of the constitutional separation of the powers of government." *Id.* at 697. *Newbry* has not been modified by an amendment to Article XVII, section 1, nor has the legislature attempted to modify the holding in *Newbry*. Moreover, this court has not overruled *Newbry*. In fact, this court recently has recognized the validity of the basic doctrine stated in *Newbry*. *OEA v. Roberts*, 301 Or 228, 721 P2d 833 (1986).

In *OEA v. Roberts, supra,* this court held that the trial court erred in dismissing an action against the Secretary of State that asserted that the Secretary of State had failed to exercise pre-enactment[2] review of an initiative measure for compliance with the single-subject requirement of Article IV, section 1(2)(d), of the Oregon Constitution. Citing prior decisions, including *Newbry*, this court in *Roberts* stated that "[b]efore 1968[,] this court consistently held that courts could not consider constitutional challenges to initiative or referendum petitions before the voters adopted the measures." *OEA v. Roberts, supra*, 301 Or at 231. However, this court concluded that Article IV, section 1, had been amended in such a way as to give rise to a specific duty requiring "the Secretary of State [to] determine whether 'proposed laws' contain one subject only," *id.* at 232, a duty that arises "when [the Secretary of State] approves a prospective petition [for signature gathering]." *Id.* at 235. Having established the existence of the Secretary of State's duty to review proposed laws for one-subject compliance, the court remanded the case to the circuit court for consideration whether the Secretary of State had discharged that responsibility properly.

---

[2] Throughout this opinion, "pre-enactment" means before the people have approved the measure at the election.

While the outcome was different, *OEA v. Roberts* reaffirmed the basic principle stated in *Newbry*. The amendments to Article IV, section 1, of the Oregon Constitution that prompted this court in *Roberts* to depart from the general principle stated in *Newbry* do not apply to proposed constitutional amendments *referred* to the people by the legislature under Article XVII, section 1, of the Oregon Constitution. In contrast to Article IV, section 1, at issue in *Roberts*, Article XVII, section 1, has not been amended to contain language similar to that relied on by this court in *Roberts*. Thus, the Secretary of State's special pre-enactment duty to review for one-subject compliance arises only in the context of initiative measures proposed under Article IV, section 1, of the Oregon Constitution. No such pre-enactment duty exists under Article XVII, section 1.

No constitutional, statutory, or decisional basis exists for the Secretary of State to conduct pre-enactment review for compliance with the "separate-amendments provision" to proposed constitutional amendments *referred* under Article XVII, section 1, of the Oregon Constitution. Article XVII, section 1, does not confer such authority on the Secretary of State. That provision states that proposed amendments "*shall* * * * be entered in their journals and *be referred by the secretary of state* to the people for their approval or rejection." (Emphasis added.) The Secretary of State *refers* the measure to the people. The "separate-amendments provision" states that separate amendments shall be "*submitted* so that each may be voted on separately." Or Const, Art XVII, § 1 (emphasis added). It is the legislature that *submits* a referred measure for approval by the people, not the Secretary of State. The Secretary of State's duty to refer a measure is a *ministerial* duty only, which provides for no exercise of independent judgment by the Secretary of State. The "separate-amendments provision" of Article XVII, section 1, is directed to the Legislative Assembly, each member of which is sworn to uphold the constitution, Or Const, Art IV, § 31, and is not directed to the Secretary of State or to any other executive official.

The Secretary of State's authority derives from Article VI, section 2, which provides:

> "The Secretary of State shall keep a fair record of the official acts of the Legislative Assembly, and the Executive Department of the State; and shall when required lay the same, and all matters relative thereto before either branch of the Legislative Assembly. He shall be by virtue of his office, Auditor of public Accounts, and shall perform other such duties as shall be assigned him by law."

Nothing in that constitutional provision authorizes the Secretary of State to engage in pre-enactment review of legislatively-referred measures for compliance with Article XVII, section 1. Neither does the Secretary of State presently have such statutory authority. House Bill (HB) 3677, codified as Oregon Laws 1993, chapter 604, directs that Ballot Measure 1 *shall* be submitted to the voters at the special statewide election to be held on November 9, 1993. Nothing in HB 3677 authorizes the Secretary of State to make a pre-enactment review of Ballot Measure 1. ORS 177.030, which defines the duties of the Secretary of State, contains no reference to pre-enactment review of referred measures.

ORS 246.110 designates the Secretary of State as "the chief election officer of the state," and the Secretary of State is charged with the duty to "diligently seek out any evidence of violation of any election law," ORS 246.046. However, Article XVII, section 1, is not an "election law" within the meaning of ORS 246.046. That statute refers only to statutory provisions governing elections.

ORS chapter 250 sets forth the applicable duties of the Secretary of State with regard to the initiative and referendum process. Nothing contained in ORS chapter 250 authorizes the Secretary of State to engage in pre-enactment review of a referred measure.

There is another persuasive reason why Article XVII, section 1, should not be read to imply a pre-enactment duty on the Secretary of State to review a legislatively-referred proposed constitutional amendment to determine whether it complies with the "separate-amendments provision." To perform that duty effectively, the Secretary of State would have to have concomitant authority to perform one of two acts if he or she concluded that a proposed measure contains more than one amendment, *i.e.*, the Secretary of State either would have to have authority to withhold the

measure from the people altogether, thereby thwarting the expressed will of the legislative branch, or the Secretary of State would have to have authority to restructure the measure by "breaking" it into separate amendments so that each could be voted on separately.[3]

Both options give the Secretary of State extraordinary legal and judgmental power and control over the constitutionally reserved legislative power to refer proposed constitutional amendments to the people for their approval. With the first option, the exercise of control is particularly obvious and direct. The Secretary of State would be empowered to veto the legislature's order of an election. The Oregon Constitution gives only one executive branch elected official — the Governor — the power to veto legislative acts. Or Const, Art V, §§ 15a and 15b. In Article XVII, section 1, the people have not conferred such a power on the Secretary of State. With the second option, the exercise of power is less direct, but nonetheless could amount to a substantial interference with the legislative process. Such a power would enable the Secretary of State to replace the legislative judgment of how to structure a proposed constitutional amendment referred to the people with his or her own judgment. In essence, it would allow the Secretary of State unilaterally to amend legislative action, thus conferring upon the Secretary of State a power that is vested in the legislature, Or Const, Art IV, § 1.

The basic structure of Article XVII, section 1, of the Oregon Constitution is that the legislature, not the Secretary of State, oversees the constitutional *referral* process. The Secretary of State, subject to legislative guidance, is given a more active role in the *initiative* process because no other elected official is present to oversee the process and ensure that it is carried out properly. The Secretary of State's role in the *referral* process, in the absence of a grant of constitutional or statutory authority, is ministerial only. Other elected officials, *i.e.*, the legislature, have the responsibility to oversee the referral process. The elected officials who comprise the legislative body are independently accountable to the electorate for their judgment. That accountability acts as a

---

[3] In fact, in this case, the effect of defendant judge's preliminary injunction is to require the Secretary of State to perform one of the two alternatives.

safeguard to ensure that the referral process in Article XVII, section 1, is not abused.

In sum, because there is no statutory or constitutional authority under which the Secretary of State could perform the acts demanded by plaintiff, plaintiff has no legal basis for the relief sought. Defendant judge should have denied relief.[4]

---

[4] Nothing in this specially concurring opinion should be construed as an expression of this author's opinion of the compliance of Ballot Measure 1 with the "separate-amendments provision" of Article XVII, section 1, of the Oregon Constitution.