Argued and submitted August 13, 2019; portion of judgment concluding that defendant had authority to review proposed initiative before election affirmed, otherwise declining to address moot issues pursuant to ORS 14.175
July 14, 2021

Lynn BOWERS,
Katja Kohler Gause,
and Tao Orion,
*Plaintiffs-Appellants,*

*v.*

Cheryl BETSCHART,
in her official capacity as
Lane County Clerk,
*Defendant-Respondent,*

*and*

Stanton F. LONG,
*Intervenor-Respondent.*

Lane County Circuit Court
17CV49280; A167596

496 P3d 1034

After gathering the requisite number of voter signatures, plaintiffs submitted to the Lane County Clerk (defendant) an initiative petition that proposed to amend the Lane County Charter. Following a pre-election review, defendant concluded that the initiative failed to comply with ORS 203.725(2), a statutory "separate-vote" requirement applicable to county charter amendments; defendant therefore declined to put the proposed measure on the ballot. Plaintiffs appeal a circuit court judgment dismissing their claims that defendant's refusal to put the measure on the ballot was unlawful, which the court entered upon granting intervenor's motion for summary judgment. Plaintiffs argue that the court erred in upholding defendant's conclusion that the disputed ballot measure failed to comply with the separate-vote requirement; plaintiffs separately argue that, even if the court correctly concluded that the proposed measure did not comply with ORS 203.725(2), defendant violated the Oregon and United States constitutions in various ways by complying with that statute. *Held*: Defendant correctly reviewed the proposed amendment of the Lane County Charter for compliance with the separate-vote requirement of ORS 203.725(2) before submitting it to the voters, and the statutory separate-vote requirement itself does not conflict with the state or federal constitutions in any of the ways identified by plaintiffs.

Portion of the judgment concluding that defendant had authority to review the proposed initiative before the election affirmed; otherwise declining to address the moot issues pursuant to ORS 14.175.

Karsten H. Rasmussen, Judge.

David Meek argued the cause and filed the briefs for appellants.

J. Aaron Landau argued the cause for respondent Stanton F. Long. On the brief were William F. Gary, Sharon A. Rudnick, and Harrang Long Gary Rudnick P.C.

Stephen E. Dingle and Office of Lane County Counsel for respondent Cheryl Betschart joined the brief of respondent Stanton F. Long.

Before DeHoog, Presiding Judge, and Mooney, Judge, and Kamins, Judge.*

DeHOOG, P. J.

Portion of the judgment concluding that defendant had authority to review the proposed initiative before the election affirmed; otherwise declining to address the moot issues pursuant to ORS 14.175.

_____

* Kamins, J., *vice* Hadlock, J. pro tempore.

**DeHOOG, P. J.**

After gathering the requisite number of voter signatures, plaintiffs submitted to the Lane County Clerk (defendant) an initiative petition that proposed to amend the Lane County Charter. Following a pre-election review, defendant concluded that the initiative failed to comply with ORS 203.725(2), a statutory "separate-vote" requirement applicable to county charter amendments; defendant therefore declined to put the proposed measure on the ballot. Plaintiffs now appeal a circuit court judgment dismissing their claims that defendant's refusal to put the measure on the ballot was unlawful, which the court entered upon granting intervenor's motion for summary judgment. Plaintiffs argue that the court erred in upholding defendant's conclusion that the disputed ballot measure failed to comply with the separate-vote requirement; plaintiffs separately argue that, even if the court correctly concluded that the proposed measure did not comply with ORS 203.725(2), defendant violated the Oregon and United States constitutions in various ways by complying with that statute. Intervenor disagrees on the merits and also asserts that this appeal is moot.[1]

As we explain below, we agree that this case is moot. However, we nevertheless exercise our discretion under ORS 14.175 to review the issues of public importance that plaintiffs' challenges raise. On the merits of those challenges, we conclude that defendant correctly reviewed the proposed amendment for compliance with the separate-vote requirement before submitting that measure to the voters and that the statutory separate-vote requirement of ORS 203.725(2) does not conflict with the state or federal constitutions in any of the ways identified by plaintiffs. As further explained below, we decline to review the circumstance-specific issue of whether the now-expired initiative in fact complied with the separate-vote requirement of ORS 203.725(2). Accordingly, we affirm the portion of the judgment concluding that defendant had authority to review the proposed initiative before the election and otherwise decline to address the remaining moot issues under ORS 14.175.

---

[1] Defendant has joined intervenor's responding brief. For simplicity, however, we refer to the arguments raised in the responding brief as intervenor's arguments.

The pertinent facts are undisputed. In September 2015, plaintiffs filed an initiative to amend the Lane County Charter. The Lane County Clerk certified the proposed measure for circulation and signature gathering. Intervenor challenged the clerk's certification of the measure in Lane County Circuit Court, contending that the clerk was required to apply the requirements of ORS 203.725 before certifying the measure for circulation.[2] The circuit court held that, by its terms, that statute applied to charter amendments proposed by initiative, but that intervenor's claim regarding the separate-vote requirement of ORS 203.725(2) was not ripe, because plaintiffs had not yet collected enough signatures to qualify the measure for the ballot.[3]

By October 2017, plaintiffs had submitted enough signatures to qualify the measure for the ballot. Defendant then notified plaintiffs that, acting on advice from county counsel, she had concluded that the proposed measure did not comply with the separate-vote requirement of ORS 203.725(2) and that, accordingly, she would not put the measure on the ballot.

In response, plaintiffs filed this proceeding under ORS 246.910(1), which allows "[a] person adversely affected by any act or failure to act by *** a county clerk *** under any election law" to "appeal therefrom to the circuit court for the county in which the act or failure to act occurred." They asserted five claims, each raising a different legal theory on which they objected to defendant's action. Plaintiffs and intervenor filed cross-motions for summary judgment, and, after briefing and argument, the court granted intervenor's

---

[2] ORS 203.725, which we discuss in more detail below, provides as follows:

"(1) A proposed amendment to a county charter, whether proposed by the county governing body or by the people of the county in the exercise of the initiative power, shall embrace but one subject and matters properly connected therewith.

"(2) When two or more amendments to a county charter are submitted to the electors of the county for their approval or rejection at the same election, they shall be so submitted that each amendment shall be voted on separately.

"(3) Notwithstanding any county charter or legislation enacted thereunder, this section shall apply to every amendment of a county charter and shall take precedence and prevail over any conflicting provisions in a county charter or in legislation enacted thereunder."

[3] Intervenor appealed that judgment, and we affirmed it without opinion. *Long v. Betschart*, 295 Or App 451, 432 P3d 1205 (2018).

motion, denied plaintiffs' motion, and entered a judgment dismissing all of plaintiffs' claims.

Plaintiffs now appeal. They assert four assignments of error, each of which raises one or more legal theories that, they contend, show that defendant unlawfully refused to put their initiative on the ballot. Intervenor first responds that this case is moot; second, intervenor argues that, to the extent that we reach the merits of plaintiffs' appeal, defendant properly reviewed the initiative for compliance with ORS 203.725(2) and correctly refused to put it on the ballot.

## MOOTNESS

We begin by considering whether we should review the merits of this appeal. Before oral argument, intervenor notified the court of his view that the period of time during which plaintiffs' charter amendment initiative was eligible to appear on the ballot had expired. Accordingly, he asserts, the case has become moot. *See Geddry v. Richardson*, 296 Or App 134, 141-42, 437 P3d 1163, *rev den sub nom Geddry v. Clarno*, 365 Or 369 (2019) ("An issue is moot if the court's decision on the matter will no longer have a practical effect on the rights of the parties."); *cf. id.* at 142 ("In the context of initiative petitions, typically, the expiration of the constitutional deadline for collecting supporting signatures for circulation will render moot any litigation over the legal sufficiency of the initiative."). In response, plaintiffs contend that the case is not moot; they argue that, unlike statewide ballot initiatives, county initiatives are not tied to a specific election and, therefore, if we rule in their favor on the merits, their initiative will appear on the ballot at the next election. For the reasons that follow, we agree with intervenor's contention that plaintiffs' appeal is moot.

Two sections of the Lane Code (LC) address the time for voting on a proposed amendment of the county charter.[4] First, section 2.635 addresses timing requirements for county initiatives generally:

---

[4] ORS 250.221 provides another timing requirement for county initiative measures; however, it gives way to county code provisions. ORS 250.155(1) ("ORS 250.165 to 250.235 *** shall apply to the exercise of initiative or referendum powers regarding a county measure, unless the county charter or ordinance provides otherwise.").

"On the filing with the County Clerk responsible for election matters of an initiative petition which proposes in a proper manner a measure of County legislation[5] and which is signed by a number of qualified voters equal to six percent of the total number of votes cast in the County for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition, *the measure shall be submitted at the next regular primary or general election following the filing of the final petition provided that, if the final petition is filed within four months prior to such election, it shall be submitted at the next succeeding primary or general election.*"

(Emphasis added.) Second, section 2.645 addresses charter amendments in particular: "Any measure relating to the amendment, revision or repeal of the Charter may be initiated by proper petition according to the procedure of LC 2.620 to 2.655 herein, except such measures shall be voted on only at the next succeeding primary or general election."

Thus, section 2.635 sets out a general rule that, if a final initiative petition is filed more than four months before a primary or general election, it must be submitted for a vote "at the next regular primary or general election following" that filing. If on the other hand, the final petition is filed less than four months before the next primary or general election, "it shall be submitted at the next succeeding primary or general election." LC § 2.635. Read together, those provisions of section 2.635 appear to require that a proposed measure be submitted for a vote at one of two future elections: either at the next regularly scheduled primary or general election or, if that election is set for less than four months after the petition is filed, at the "next regular primary or general election" after that. *Id.*

Section 2.645 appears to narrow the general rule set forth in section 2.635 and specifically governs measures "relating to the amendment, revision or repeal of the Charter." For those measures, the procedures set out in sections 2.620 to 2.655—which necessarily include those set forth in section 2.635—apply, except that any such measure

---

[5] The code defines "County legislation" to include "any measure proposing * * * the repeal, revision or amendment of the Charter." LC § 2.620.

"shall be voted on *only* at the next succeeding primary or general election." LC § 2.645 (emphasis added).

Plaintiffs argue that "the next succeeding primary or general election" in section 2.645 "is not a fixed date." As we understand their contention, plaintiffs' view is that section 2.645 requires a county clerk to submit a measure to a vote at the next regular primary or general election following a final determination that an initiative petition meets all of the requirements for submission—even if that determination occurs years after the petition is filed, as would be the case here if this litigation were to conclude in plaintiffs' favor. However, plaintiffs offer no textual support for that understanding. By its terms, section 2.645 allows for, at most, two potential dates for submission: either "the next regular primary or general election following the *filing of the final petition*" or the election following that one. LC § 2.635 (emphasis added); LC § 2.645 (incorporating requirements of preceding rules, including LC § 2.635).[6] Indeed, section 2.645 may allow for only *one* potential submission date— that of the next "succeeding" primary or general election— regardless of whether a petition is filed more or less than four months before the next election. LC § 2.645 (authorizing clerk to submit measure to a vote "only" at "next succeeding" election). In no event, however, does section 2.645 appear to allow a measure to be voted on at some time after the next two regularly scheduled primary or general elections have passed.

Here, the final petition was filed in October 2017. Under the Lane Code, the proposed charter amendment had to be submitted for a vote at one of the next two primary or general elections after that date. It is undisputed that, as of the filing of plaintiffs' appeal in this case, those elections had long since passed; as a result, no ruling in this case could overcome that obstacle to the placement of plaintiffs' initiative on the ballot. Consequently, plaintiffs' appeal is moot. *Cf. Geddry*, 296 Or App at 142 (noting that, after expiration of the deadline for collecting signatures, a statewide initiative petition had "expired" and, consequently,

---

[6] The Lane Code defines "[f]inal petition" as "the petition signed by the number of qualified voters required by LC 2.625 below." LC § 2.620.

litigation about it was moot (internal quotation marks omitted)).

However, that does not end our inquiry. We have discretion to review the merits of moot issues of public importance if they are capable of repetition and likely to evade review. *See Couey v. Atkins*, 357 Or 460, 463, 522-23, 355 P3d 866 (2015) (holding that cases involving issues of public interest that are "likely to evade judicial review under the standard set out in ORS 14.175" are justiciable even if they are moot). Under ORS 14.175, we may decide a moot challenge to an act of a public body or official if "(1) the party that commenced the action had standing to commence it, (2) the challenged act *** is capable of repetition, and (3) the challenged act is likely to evade judicial review in the future." *Harisay v. Atkins*, 295 Or App 493, 496, 434 P3d 442 (2018), *aff'd sub nom Harisay v. Clarno*, 367 Or 116, 474 P3d 378 (2020) (paraphrasing ORS 14.175); *see also Eastern Oregon Mining Association v. DEQ*, 360 Or 10, 18-19, 376 P3d 288 (2016) (applying the third criterion).

Here, no party contends that those criteria are not met, and we are satisfied that they are. *See Geddry*, 296 Or App at 142 (explaining how the criteria were met under similar circumstances in case involving certification of a state initiative petition); *see also Couey*, 357 Or at 481-83 (noting that elections cases have often satisfied the capable of repetition and likely to evade review criteria). Furthermore, prudential considerations weigh in favor of our exercising our discretion to address certain issues of public importance present in this case. *See Eastern Oregon Mining Assoc. v. DEQ*, 285 Or App 821, 830-32, 398 P3d 449 (2017), *aff'd*, 365 Or 313, 445 P3d 251 (2019) (setting out a nonexclusive list of prudential considerations relevant to decision whether to review moot issues, including judicial economy and the relative public importance of the case). The parties have fully developed the record and their legal arguments, and the scope of a county clerk's authority to review proposed charter amendments before submitting them to the voters "has obvious implications for future elections and is an issue of public importance." *Geddry*, 296 Or App at 143 (noting the same where the challenge involved the Secretary of State's "preelection authority to review initiative petitions

for compliance with constitutional requirements governing the initiative power"). We will therefore proceed to decide that issue, notwithstanding the mootness of plaintiffs' appeal.

We do not, however, elect to address *all* of the issues raised on appeal. Specifically, much as in our *Geddry* decision, we conclude that the fact-bound question of whether the particular initiative at issue here meets the separate-vote requirement of ORS 203.725(2) does not merit an exercise of our discretion to address moot issues. 296 Or App at 148 (declining to exercise discretion to reach the merits of the moot question "whether the language of a now-expired initiative petition was compliant with Oregon constitutional requirements"); *see also Eastern Oregon Mining Assoc.*, 285 Or App at 834 (declining to address a moot issue that "does not present a recurring legal issue that has implications beyond this particular litigation"). Thus, we decline to review that aspect of the judgment.

## MERITS

We turn, then, to whether ORS 203.725(2) authorized defendant to conduct separate-vote review of plaintiffs' initiative petition and, if so, whether the statute also allowed the review to be conducted before, rather than after, the election. Plaintiffs contend that, for a variety of reasons, it did not, and, to the extent that it might otherwise permit that review, it violates both the state and federal constitutions.

ORS 203.725(2) provides, "When two or more amendments to a county charter are submitted to the electors of the county for their approval or rejection at the same election, they shall be so submitted that each amendment shall be voted on separately." Thus, the text of that provision directs the county clerk—the official who is responsible for submitting county charter amendments to the electors, *see* ORS 254.005(2)(b) (defining "[c]hief elections officer" as the "[c]ounty clerk, regarding * * * a measure to be voted on in a county only")—to submit proposed amendments to the electors in a way that ensures "that each amendment shall be voted on separately."

Plaintiffs contend that, if the statute is construed to permit separate-vote review by a county clerk, it infringes on the initiative power reserved to the people in the Oregon Constitution and specifically reserved to county voters in Article VI, section 10. In their view, the constitution reserves to the voters of each county an unfettered right to amend a county charter by initiative. Given that, they argue that the legislature cannot direct a county clerk to disqualify a measure from the ballot for lack of compliance with a statutory separate-vote requirement.

In response, intervenor points out that Article VI, section 10, gives the legislature responsibility for providing "a method whereby the legal voters of any county, by majority vote of such voters voting thereon at any legally called election, may adopt, amend, revise or repeal a county charter." Intervenor contends that the separate-vote requirement of ORS 203.725(2) is part of that "method," and, consequently, that it is consistent with county voters' constitutional initiative powers.

As explained below, we conclude that pre-election review of initiatives proposing county charter amendments for compliance with a separate-vote requirement does not violate the initiative power reserved to county voters in Article VI, section 10. Thus, the trial court correctly rejected plaintiffs' argument to the contrary.

Article VI, section 10, does many things in a single long paragraph. It reserves initiative powers to county voters; requires the legislature to provide a "method" for voters to adopt, amend, revise, or repeal a county charter; describes the required and permissible substance of a county charter; and provides some detailed procedural rules, including signature requirements, for the county initiative and referendum process.[7] Article VI, section 10, was referred to

---

[7] Article VI, section 10, provides, in relevant part, as follows:

"**County home rule under county charter.**  The Legislative Assembly shall provide by law a method whereby the legal voters of any county, by majority vote of such voters voting thereon at any legally called election, may adopt, amend, revise or repeal a county charter. A county charter may provide for the exercise by the county of authority over matters of county concern. Local improvements shall be financed only by taxes, assessments or charges imposed on benefited property, unless otherwise provided by law

the voters by the legislature and adopted in 1958. It was amended in 1960 and 1978, but the amendments are not relevant to our analysis.

In *Multnomah County v. Mittleman*, 275 Or 545, 552 P2d 242 (1976), the Supreme Court examined the scope of the referendum powers reserved to county voters by Article VI, section 10. At issue was a county property-transfer tax ordinance, which included an emergency clause intended to prevent a referendum on the ordinance. 275 Or at 547. Notwithstanding the emergency clause, a referendum reached the ballot, where the ordinance was rejected. *Id.* Undeterred, the county sought to enforce the ordinance, and a property owner contested that action, arguing that the ordinance was invalid because the voters had defeated it using their reserved referendum power. *Id.* On review, the Supreme Court framed the issue at hand as "whether a home-rule county may declare an 'emergency' in an ordinance imposing new taxes and thereby prevent a referendum of such an ordinance." *Id.* at 548.

In analyzing that question, the court explored the relationship between the statewide referendum powers reserved to the people by Article IV, section (3)(a), of the Oregon Constitution, and the referendum powers reserved to county voters by Article VI, section 10. The court concluded that "the purpose and effect of Article VI, section 10, was to reserve to county voters with respect to county tax legislation the same 'referendum powers' previously reserved to

---

or charter. *** The initiative and referendum powers reserved to the people by this Constitution hereby are further reserved to the legal voters of every county relative to the adoption, amendment, revision or repeal of a county charter and to legislation passed by counties which have adopted such a charter; and no county shall require that referendum petitions be filed less than 90 days after the provisions of the charter or the legislation proposed for referral is adopted by the county governing body. To be circulated, referendum or initiative petitions shall set forth in full the charter or legislative provisions proposed for adoption or referral. Referendum petitions shall not be required to include a ballot title to be circulated. In a county *** a number of signatures of qualified voters equal to but not greater than eight percent of the total number of votes cast in the county for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition shall be required for a petition to propose a charter amendment."

(Boldface in original.)

state voters with respect to state tax legislation." *Id.* at 551. That is, the reserved referendum powers of county voters mirror the referendum powers reserved to the voters of the state on the same subject.

Having determined that relationship between state-wide and county referendum powers, the court began its analysis by explaining the history of the statewide referendum power on tax measures. It concluded that, following the amendment of Article IX, section 1(a),[8] in 1912, it was "as if the Oregon Constitution included a provision expressly stating that all tax measures enacted by the legislature are subject to referendum" regardless of whether they contain an emergency declaration. *Mittleman*, 275 Or at 551.

Next the court applied the principle that county voters' referendum powers mirror state voters' referendum powers on the same subject: Because the constitution reserved to the people a referendum power that could not "be defeated by the declaration by the Oregon legislature of an emergency in the enactment of tax legislation," likewise, "a home-rule county may not defeat the exercise of such 'referendum powers' by the declaration of an emergency in the enactment of such legislation." *Id.* at 551, 551-52.

In response to the county's argument that, by its terms, Article IX, section 1(a), applied only to the legislature, and not to counties, the court reiterated that, when the voters adopted Article VI, section 10, in 1958, they were reserving to county voters the same referendum powers that state voters had at that time:

> "The point, as we see it, is not that Article IX, section 1(a), was intended in 1912 to apply to the Oregon legislature. Instead, the point is that in 1958, when the County Home Rule Amendment was adopted as Article VI, section 10, the same 'referendum powers reserved to the people by this Constitution' relative to legislation passed by the state legislature were 'further reserved to the legal voters of every [home-rule] county relative to * * * legislation passed by [such] counties.'"

---

[8] Article IX, section 1(a), of the Oregon Constitution provides that "[n]o poll or head tax shall be levied or collected in Oregon. The Legislative Assembly shall not declare an emergency in any act regulating taxation or exemption."

*Id.* at 552-53 (quoting Or Const, Art VI, § 10 (alterations in *Mittleman*)).

Thus, as we understand *Mittleman*, to determine the scope of the powers "reserved to the legal voters of every county relative to the *** amendment *** of a county charter by initiative," we must first determine what initiative powers are "reserved to the people by this Constitution" on the same subject. Or Const, Art VI, § 10 ("The initiative and referendum powers reserved to the people by this Constitution hereby are further reserved to the legal voters of every county relative to the adoption, amendment, revision or repeal of a county charter and to legislation passed by counties which have adopted such a charter."). That is, although *Mittleman* addressed the referendum power reserved to county voters, the Supreme Court's analysis was rooted in a provision of Article VI, section 10, equally applicable to initiatives and referendums. Moreover, *Mittleman* teaches that, for purposes of that inquiry, the relevant statewide reserved powers are not limited to those addressed directly to county-specific matters; rather, the question is what powers the constitution reserves to the people on a statewide level that are analogous to the county-specific subject at issue. *See* 275 Or at 552-53 (rejecting the contention that a constitutional limit on tax measures did not apply to counties through Article VI, section 10, because it referred only to the legislature, not to counties).

With *Mittleman* in mind, we turn to Article XVII, section 1, of the Oregon Constitution, which subjects statewide initiatives seeking to amend the constitution to a separate-vote requirement that closely mirrors that imposed by ORS 203.725(2) on proposed charter amendments.[9] Since 1906, that requirement has applied equally "to constitutional amendments proposed by initiative, as well as those proposed by the legislature." *Armatta v. Kitzhaber*, 327 Or 250, 261, 959 P2d 49 (1998); *see also id.* at 260 (noting that, in amending Article XVII in 1906 "by specifically incorporating references to the people's recently acquired initiative

_____

[9] The separate-vote requirement of Article XVII, section 1, provides, "When two or more amendments shall be submitted in the manner aforesaid to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

power, it appears that the voters intended the requirements contained in Article XVII, which originally pertained only to legislatively proposed amendments, to apply to initiated amendments as well"). In *Meyer v. Bradbury*, 341 Or 288, 297, 142 P3d 1031 (2006), the Supreme Court explained that the purpose of requiring constitutional amendments to be submitted and voted on separately is to allow "voters [to] express[] their opinions as to each proposed change separately." That requirement provides "a safeguard that is fundamental to the concept of a constitution." *Id.* at 296. Thus, the separate-vote requirement protects constitutional interests above legislative interests by allowing voters to more carefully consider whether to make a specific amendment, rather than making groups of amendments together, as is permitted in the legislative context. *See id.* ("'It is axiomatic that, among the various interests that the government of this state seeks to protect and promote, *the interests represented by the state constitution are paramount to legislative ones.*'" (Quoting *State v. Stoneman*, 323 Or 536, 542, 920 P2d 535 (1996) (emphasis in *Meyer*).)).

In other words, Oregon's separate-vote requirement for constitutional amendments preserves a "hierarchy of law" that "always must be acknowledged and respected": Organic law must be amended more carefully than mere legislation. *See id.* The way the constitution provides that protection for organic law is by allowing voters to express their opinion as to each proposed change separately. *Id.*

In light of Article XVII, section 1, the statewide initiative powers "reserved to the people" under Article IV are— and, since 1906, have been—limited by the requirement that each constitutional amendment be submitted separately.[10] That limitation applies in order to preserve the hierarchy of law, in which organic law is superior to ordinary legislation and, consequently, must be amended more carefully.

A charter in a home-rule county is analogous to a state constitution. *Cf. Portland Police Assn. v. Civil Service Board*, 292 Or 433, 440, 639 P2d 619 (1982) ("A

---

[10] Article IV, section 1(2)(a) provides, "The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly."

city's charter is, in effect, the city constitution."); *Harder v. City of Springfield*, 192 Or 676, 683, 236 P2d 432 (1951) ("A city charter constitutes the organic law of a municipality."). And in view of the similar functions that the state constitution and county charters play in their respective settings, we conclude that, when Article VI, section 10, was enacted in 1958, it reserved no greater initiative power on behalf of county voters seeking to amend a county charter than did the predecessor to Article IV, section 1(2)(a), on behalf of statewide voters seeking to amend the Oregon Constitution.[11] *See Mittleman*, 275 Or at 552-53 ("The point, as we see it, is not that Article IX, section 1(a), was intended in 1912 to apply to the Oregon legislature. Instead, the point is that in 1958, when the County Home Rule Amendment was adopted as Article VI, section 10, the same 'referendum powers reserved to the people by this Constitution' relative to legislation passed by the state legislature were 'further reserved to the legal voters of every [home-rule] county relative to *** legislation passed by [such] counties.'" (Quoting Or Const, Art VI, § 10 (alterations in *Mittleman*).)).

It follows that, like the statewide initiative powers reserved to the people under Article IV, section 1(2)(a), the right extended to county voters under Article VI, section 10, carries with it no prohibition against the imposition of a separate-vote requirement such as that set forth in ORS 203.725(2). Therefore, that statute does not infringe on county voters' constitutionally reserved initiative powers.[12]

---

[11] In 1902, Article IV, section 1, "was amended to grant the people the initiative and referendum power, including the ability to propose constitutional amendments by initiative petition." *Armatta*, 327 Or at 259. After that 1902 amendment, Article IV, section 1, provided, as relevant here, "The legislative authority of the state shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and amendments to the constitution and to enact or reject the same at the polls, independent of the legislative assembly ***." As noted above, present-day Article IV, section 1(2)(a) provides, "The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly."

[12] In reaching that conclusion, we note that the text of ORS 203.725(2) is nearly identical to the text of the separate-vote requirement of Article XVII, section 1. In light of that similarity, it goes largely without saying that the separate-vote requirements of the statute impose no greater a burden on petitioners seeking to amend a county charter than does Article XVII, section 1, on petitioners seeking to amend the Oregon Constitution.

Plaintiffs next contend that, to the extent that the legislature may constitutionally impose a separate-vote requirement on an initiative seeking to amend a county charter, a county clerk lacks authority to conduct a pre-election review of an initiative to ensure compliance with that requirement. We disagree.

First, as noted above, Article VI, section 10, tasks the legislature with enacting a "method whereby the legal voters of any county, by majority vote of such voters voting thereon at any legally called election, may adopt, amend, revise or repeal a county charter." And, separate from their substantive challenges to ORS 203.725(2), plaintiffs advance no argument suggesting that defendant's pre-election review to ensure compliance with that statute cannot be viewed as simply part of such a "method," and we conceive of none.

Second, to the extent that plaintiffs contend that "substantive" review of a proposed measure before an election is never constitutionally permissible, they reprise an argument that we expressly rejected in *Geddry*, 296 Or App at 146, as we will explain.

In *Geddry*, the plaintiffs filed an initiative petition and signatures with the Secretary of State, but the secretary concluded that the initiative would violate the separate-vote requirement and therefore rejected it. *Id.* at 138. The plaintiffs sought review in circuit court, and the court held that the secretary had improperly conducted a substantive review of the initiative. *Id.* at 138-39. The secretary appealed.

After reviewing the Supreme Court's case law on the topic, we explained that the law did not support the distinction that the trial court had drawn

"between preelection 'substantive' analysis of a proposed measure for compliance with Article XVII and some type of lesser review. It is true that the secretary may not invalidate a measure because of his belief that the measure, *if enacted*, would substantively violate another provision of the state or federal constitutions. That does not mean, however, that the secretary may not engage in 'substantive' review to determine whether the measure *complies with*

*the limitations on the initiative power itself* set forth in the Oregon Constitution."

*Id.* at 145 (emphasis in original). Rather, we explained that the cases supported "the idea that the secretary may (indeed, must) review measures before certifying them for compliance with Article XVII's limitations on the use of the initiative power, and none of them suggest that that obligation must be fulfilled without 'substantive' review and analysis." *Id.* at 146. Accordingly, we reversed the decision of the trial court. *Id.* at 149.

Our holding in *Geddry* demonstrates that pre-election review for compliance with constitutional limitations on the initiative power—including the separate-vote requirement—is permissible. Thus, we reject plaintiffs' argument that pre-election separate-vote review is never allowed.

Third, we are unpersuaded by plaintiffs' argument that, even assuming that pre-election review of a statewide initiative by the Secretary of State does not violate the constitution, a county clerk cannot do the same for a county initiative. Plaintiffs seem to contend that Article IV, section 1(2)(d), which was enacted in 1968, is the source of the Secretary of State's power to conduct pre-election separate-vote review of statewide measures. They reason that, because Article VI, section 10, incorporated the initiative power that existed when it was enacted in 1958, and because that provision has not been amended to allow pre-election review, such review of county charter amendments by county clerks is prohibited. They also argue that the Supreme Court's holding in *Foster v. Clark*, 309 Or 464, 790 P2d 1 (1990), which suggests otherwise, is irrelevant to county clerks' ability to conduct pre-election review. As explained below, we disagree with both contentions.

We begin by considering Article IV, section 1(2)(d). That provision does not, itself, contain a separate-vote requirement; rather, it contains a single-subject requirement: "A proposed law or amendment to the Constitution shall embrace one subject only and matters properly connected therewith." *See also, e.g.*, *OEA v. Roberts*, 301 Or 228, 232, 721 P2d 833 (1986) (reasoning that the text of

Article IV, section 1(2)(d), necessarily allows for pre-election review for compliance with that provision's single-subject requirement, as it refers to a *proposed* law or amendment, not just an enacted one). And, although plaintiffs cite the text of Article IV, section 1(2)(d), they appear to recognize that that text itself is not the source of the separate-vote requirement. Rather, we understand their argument to be based more broadly on that provision in context with the other 1968 amendments to Article IV, section 1, which variously charge the Secretary of State with administering the initiative process and demonstrate that, before placing a proposed initiative on the ballot, the secretary must review it for compliance with constitutional requirements. *See OEA*, 301 Or at 232 (so holding with respect to the single-subject requirement of Article IV, section 1(2)(d)).

We do not disagree with plaintiffs' basic contention that Article IV, section 1, permits the Secretary of State to conduct pre-election review of initiatives to ensure their compliance with various constitutional requirements. However, we part ways with plaintiffs when they assert that the granting of such authority over statewide measures demonstrates that county clerks lack similar powers in regard to proposed charter amendments.

Instead, we understand the Supreme Court to have held in *Foster* and cases following it that pre-election review of initiatives to comply with the constitutional requirements for initiatives—including the separate-vote requirement—is permissible whether conducted by the Secretary of State or by a local official. In *Foster*, the court was asked to evaluate a proposed City of Portland ballot measure before the election. The Supreme Court identified "two lines of cases" that "appear[ed] to run in different directions" on the propriety of pre-election review of proposed ballot initiatives. It did not distinguish between cases addressing statewide initiatives, county initiatives, or city initiatives. The court characterized the first line of cases as holding that "a court will not inquire into the substantive validity of a measure—*i.e.*, into the constitutionality, legality or effect of the measure's language—unless and until the measure is passed." *Id.* That first line of cases included, among others, "*State v. Newbry*, 189 Or 691, 697-98, 222 P2d 737 (1950) (compliance

of proposed constitutional amendment with requirement that each constitutional amendment be stated separately),” and “*Unlimited Progress v. Portland*, 213 Or 193, 195-96, 324 P2d 239 (1958) (municipal measure).” *Foster*, 309 Or at 469 n 4.

In the other line of cases, the court explained, “Oregon courts have inquired into whether matters extraneous to the language of the measure itself disqualify the measure from the ballot.” *Id.* In the court’s view, those cases indicated that, “[d]espite compliance with proper procedures, courts will prevent a measure from being placed on the ballot if the measure is legally insufficient to qualify for that ballot.” *Id.* at 469. The court placed *Holmes v. Appling*, 237 Or 546, 392 P2d 636 (1964), and *City of Eugene v. Roberts*, 305 Or 641, 756 P2d 630 (1988), among others, in that second line of cases.

The court then held as follows:

> “We adhere to the more recent authorities, such as *Holmes v. Appling*, as being the more clearly reasoned and stating the correct rule, which is: Courts have jurisdiction and authority to determine whether a proposed initiative or referendum measure is one of the type authorized by [the Oregon Constitution, Article IV, section 1(5),] to be placed on the ballot. *** On the other hand, a court may not inquire into general questions of constitutionality, such as whether the proposed measure, if enacted, would violate some completely different portion of the constitution.”

*Foster*, 309 Or at 470-71.

As we understand that holding, the Supreme Court in *Foster* rejected the reasoning of the first line of cases and, in doing so, overruled the holdings of those cases insofar as they prohibited all pre-election review of initiatives. We articulated that understanding of *Foster* in *Meyer v. Bradbury*, 205 Or App 297, 301-03, 134 P3d 1005, *rev’d on other grounds*, 341 Or 288, 142 P3d 1031 (2006). In *Meyer*, we relied on *Foster* in concluding that a pre-election separate-vote challenge to a statewide initiative was justiciable. The Supreme Court affirmed our conclusion on that point and expressly approved of our analysis. *Meyer*, 341 Or at 294 (“For the reasons stated in the Court of Appeals opinion,

we agree with that court's assessment of intervenor's arguments regarding justiciability and standing and decline to examine those particular issues further.").

We reached the same conclusion in *Geddry*, explaining that the *Geddry* plaintiffs' reliance on *Newbry* was misplaced because that case had been disavowed. *Geddry*, 296 Or App at 146. We discussed the court's reasoning in *Foster* and noted that, in that case, the court had explained that the second line of cases

> "stated the 'correct rule': Proposed initiatives may be evaluated before an election to determine whether they are of the type authorized by the Oregon Constitution to be placed on the ballot but may not be evaluated for 'general questions of constitutionality, such as whether the proposed measure, if enacted, would violate some completely different portion of the constitution.'"

*Geddry*, 296 Or App at 147 (quoting *Foster*, 309 Or at 471).

Notably, *Foster* involved a City of Portland initiative, not a statewide initiative; thus, it did not involve any question of the powers of the Secretary of State. Rather, the constitutional provision at issue in *Foster* was Article IV, section 1(5), which was enacted in 1906 and provides that "[t]he initiative and referendum powers reserved to the people by subsections (2) and (3) of this section are further reserved to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district."[13]

As noted above, in *Foster*, the court did not distinguish between municipal, county, and statewide initiatives. In *Meyer*, we and the Supreme Court each concluded that *Foster*'s holding applied to statewide initiatives, notwithstanding its focus on a city initiative process. 341 Or at 294 (adopting reasoning—that *Foster* allows pre-election review of statewide measures for separate-vote compliance—from

---

[13] Counties qualify as "municipalities" under that provision; thus, Article IV, section 1(5), reserves the initiative power to county voters. *See Carriker v. Lake County*, 89 Or 240, 244-46, 171 P 407 (1918) (considering the scope of county voters' initiative powers under the provision that is now Article IV, section 1(5)). However, the constitution did not provide for adoption—or amendment—of county charters until Article VI, section 10, was enacted in 1958.

*Meyer*, 205 Or App at 302-03); *see also Geddry*, 296 Or App at 146-47 (applying *Foster*'s holding in allowing pre-election review of a statewide initiative for compliance with separate-vote requirement). Although plaintiffs contend that we should understand *Foster* as not applying to county ballot measures, they do not identify any reason—other than the mere fact that *Foster* involved a city initiative—why we should do so. Given that the Supreme Court has itself applied its reasoning in *Foster* outside the narrow confines of its specific subject matter, we are not persuaded to read its holding narrowly here. Rather, we conclude that the holding of *Foster* applies not only to pre-election review of city initiatives, but to pre-election review of initiatives more generally, including county initiatives subject to Article VI, section 10.

In applying *Foster*, we have explained that, "[p]roposed initiatives may be evaluated before an election to determine whether they are of the type authorized by the Oregon Constitution to be placed on the ballot[.]" *Geddry*, 296 Or App at 147 (citing *Foster*, 309 Or at 470-71). Here, of course, defendant's review of the initiative was not to ensure that it was "of the type authorized by the Oregon Constitution." *Id*. Rather, defendant's review was to ensure compliance with ORS 203.725(2). But, as we have explained, county voters' initiative rights under Article VI, section 10, must be viewed in light of the separate-vote requirement of Article XVII, section 1, which carries with it the authority to conduct pre-election review. Thus, like petitioners seeking to amend the state constitution under Article IV, section 1(2)(a), county voters have no right under Article VI, section 10, to avoid pre-election separate-vote review of proposed charter amendments. *See Geddry*, 296 Or App at 147; *Meyer*, 205 Or App at 302-03 ("[A] challenge to a proposed measure on the ground that it violates the separate-vote requirement may be brought before the election.").

To the extent that plaintiffs contend that pre-election review cannot be allowed under Article VI, section 10, because it was not allowed in 1958, when the initiative power was reserved to county voters, we disagree. As explained above, in *Foster*, the Supreme Court identified two lines of cases that ran in different directions, adhered to the line of

cases that allowed limited pre-election review, and rejected the line of cases that did not allow it. As the court characterized it, those two lines of cases both began early in the twentieth century. *Foster*, 309 Or at 469 n 4, 470 (citing *State ex rel. Carson v. Kozer*, 126 Or 641, 270 P 513 (1928), as the earliest of the cases prohibiting pre-election review and *Monahan v. Funk*, 137 Or 580, 3 P2d 778 (1931), as the earliest of the cases allowing pre-election review). Thus, in *Foster*, the court held that the correct rule had not been clear since the early twentieth century but, in fact, it had always been that, as we paraphrased in *Geddry*, "[p]roposed initiatives may be evaluated before an election to determine whether they are of the type authorized by the Oregon Constitution to be placed on the ballot." *Geddry*, 296 Or App at 147. Under these circumstances, the fact that Article VI, section 10, reserved to county voters the initiative power as it existed in 1958 does not preclude pre-election review; rather, under *Foster*, limited pre-election review has always been permitted under the Oregon Constitution, even if the decisions of the Supreme Court did not uniformly recognize that fact until relatively recently.

To summarize, we conclude that the application of the separate-vote requirement imposed by ORS 203.725(1) to initiatives proposing county charter amendments under Article VI, section 10, does not infringe upon any rights guaranteed by that constitutional provision. We also reject petitioners' argument that the constitution prohibits county clerks from conducting pre-election review to ensure compliance with that separate-vote requirement. *Cf. Geddry*, 296 Or App at 147 (so holding as to Secretary of State's authority to conduct pre-election review to ensure compliance with Article XVII, section 1, of the Oregon Constitution).

We now briefly consider one of plaintiffs' remaining challenges to defendant's determination that the proposed ballot measure did not satisfy the requirements of ORS 205.725(2). We reject without discussion plaintiffs' remaining challenges, including their free speech, Due Process, and vagueness challenges and their contention that ORS 203.725(2) cannot be carried out without additional implementing legislation.

Plaintiffs raise a challenge under a separate pro-vision of the Oregon Constitution, contending that ORS 203.725(2) violates the separation of powers provisions of Article III, section 1.[14] They contend that both the county clerk and the trial court exercised legislative—rather than administrative or judicial—power in determining whether the initiative violated the separate-vote requirement of ORS 203.725(2), because that function is "reserved to the citizen-legislators of the county." We must reject that argument because, as we have explained, the powers reserved to the citizen-legislators of the county by Article VI, section 10, are limited in light of the separate-vote requirement of Article XVII, section 1, and the constitution has empowered the leg-islature to enact a "method" for amending county charters.

Thus, we conclude that defendant correctly reviewed the proposed amendment of the Lane County Charter for compliance with the separate-vote requirement of ORS 203.725(2) before submitting it to the voters and that the statutory separate-vote requirement itself does not conflict with the state or federal constitutions in any of the ways identified by plaintiffs. Accordingly, we affirm.

Portion of the judgment concluding that defendant had authority to review the proposed initiative before the election affirmed; otherwise declining to address the moot issues pursuant to ORS 14.175.

---

[14] Article III, section 1, provides as follows: "The powers of the Government shall be divided into three separate branches, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with offi-cial duties under one of these branches, shall exercise any of the functions of another, except as in this Constitution expressly provided."